UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ZOE RITCHEY,                        )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        No. 4:04 CV 78 DDN
                                    )
JO ANNE B. BARNHART,                )
COMMISSIONER OF                     )
SOCIAL SECURITY,                    )
                                    )
                Defendant.          )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Zoe Ritchey for disability benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq. The parties consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.   BACKGROUND

### A.   Plaintiff's Application and Medical Records

In July 2002 plaintiff, who was born in 1953, applied for disability benefits alleging she became disabled on December 1, 1995,[1] due to chronic pain, depression, and the effects from a previously broken left wrist.  (Tr. 58-60, 62-83, 117.)

Plaintiff's work history includes work as a nurse's aid from February 1983 to July 1986, and as a private duty nurse from July 1986 to November 1995.  Plaintiff's wage history for the past 15 years is as follows:

| | | | |
|---|---|---|---|
| 1981 | $    .00 | 1989 | 15,719.00 |
| 1982 | .00 | 1990 | .00 |
| 1983 | 3,323.58 | 1991 | 11,603.00 |

---

[1]Plaintiff later amended her disability onset date to August 22, 2000.

| 1984 | 3,445.74 | 1992 | 12,096.75 |
|------|----------|------|-----------|
| 1985 | 4,639.08 | 1993 | 12,808.00 |
| 1986 | 7,939.86 | 1994 | 12,435.00 |
| 1987 | 10,391.00 | 1995 | 9,151.00 |
| 1988 | .00 | | |

(Tr. 38-44.)

In a July 22, 2002, claimant questionnaire, plaintiff reports having daily pain made worse by stress, with some days worse than others. Plaintiff said that nothing helps her symptoms, but she was taking Lorazepam,[2] Effexor,[3] Celexa,[4] and Oxycontin.[5] Plaintiff reports side-effects including fatigue, dry mouth, constipation, and weight gain. (Tr. 98.)

Plaintiff reports she used to like participating in bingo games, but she is no longer able to attend. She is also unable to clean her house or cook meals. Plaintiff further reports that she has difficulty falling asleep and staying asleep. Plaintiff reports difficulty with personal grooming and that she only gets dressed to see the doctor. Plaintiff states she cannot prepare meals because she cannot stand long enough to cook. Therefore, her husband does the majority of the cooking. Plaintiff reports she does little shopping, unless she has someone to go with her. Plaintiff needs assistance getting to the grocery store, and loading and unloading the groceries. Plaintiff says she does laundry, but needs help cleaning the bathroom, vacuuming,

---

[2]Lorazepam, commonly referred to as Ativan, "is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms." Physician's Desk Reference (PDR), 3348 (55th ed. 2001).

[3]"Effexor is indicated for the treatment of depression." Id. at 3361.

[4]Celexa "is indicated for the treatment of depression." Id. at 1258.

[5]Oxycontin is "indicated for the management of moderate to severe pain where the use of an opioid analgesic is appropriate for more than a few days." Id. at 2698.

-2-

sweeping and mopping.  Her husband and sister do much of the household cleaning.  (Tr. 99-100.)

With respect to recreational activities, plaintiff reports she watches television and reads.  Plaintiff does not drive often. Plaintiff reports leaving her home no more than five times per month, and mostly to see the doctor, with occasional visits to see her children and grandchildren and to the store.  Plaintiff reports it is difficult for her to get ready to leave the house, and she would rather be "in my chair with my [pajamas]-I hate going anywhere."  Plaintiff reports she often does not feel like talking with others anymore.  (Tr. 100-01.)

Regarding her physical abilities, plaintiff reports she tries to walk on her treadmill for 15-20 minutes three times per week; however, she says this is not always possible and it does not seem to help her condition.  Plaintiff reports her condition limits her to sitting very little, walking only from the bedroom to the living room unless she is exercising, using her hands very little, kneeling and squatting very little, reaching very little, and reaching overhead very little. Plaintiff further reports she does not lift or carry objects or climb stairs.  With respect to sitting, plaintiff reports "that [sic] the most I do."  Plaintiff reports her limiting pain is constant and in all of her joints.  (Tr. 102.)

Plaintiff's sister Lacedra Jensen completed a third party "Daily Activities Questionnaire."  She reported cleaning plaintiff's house because plaintiff "feels unable to-she hurts all the time."  Ms. Jensen noted plaintiff rarely dresses anymore, she leaves her house only for physician appointments, and she never socializes.  She reports plaintiff used to enjoy leaving her house for bingo and dancing.  (Tr. 103.)

Plaintiff's medical records begin with treatment records spanning May 5, 1994, to May 15, 2001, from Gary Sattman, D.O.  From May 1994 to May 2001, the medical records evidence, with notable exception, general check-ups and illnesses not related to her alleged disabling impairments.   On February 21, 1996, plaintiff requested Ativan;[6]

---

[6]Ativan "is indicated for the management of anxiety disorders for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms."  Id. at 3348.

however, the treatment record is difficult to read and there is no real indication why plaintiff requested this prescription.  On August 21, 1996, plaintiff reported being depressed and she was prescribed antidepressants.  On September 30, 1996, and October 2, 1996, plaintiff noted her lower back was feeling better, and it appears as though she was continued on antidepressants.  On December 2, 1996, plaintiff was given a prescription "for stress."  On January 25, 1997, plaintiff requested a referral to an orthopedist regarding pain in her lower back. In September 1997, plaintiff continued to complain of pain in her back, with no injury.  On October 26, 1998, plaintiff complained of pain in her left knee when she was kneeling to clean houses.  On May 19, 1999, plaintiff complained of all over aches and pains in her joints and muscles.  On August 11, 1999, plaintiff reported that her antidepressant prescription for Elavil[7] was not working.  (Tr. 134-148.)

In November 1999, plaintiff complained of pain after dropping a box on her right foot.  On December 27, 1999, plaintiff reported that she was taking Prozac[8] and it was no longer helping her.  On March 28, 2000, plaintiff complained of "having a lot of stress."  June 30, 2000, treatment records show plaintiff was diagnosed with fibromyalgia.[9]  On

_____

[7]Elavil is indicated "[f]or the relief of symptoms of depression." Id. at 626.

[8]Prozac "is used to treat mental depression. It is also used to treat obsessive-compulsive disorder, bulimia nervosa, and premenstrual dysphoric disorder." MedlinePlus at http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202247.htm (last visited August 19, 2005).

[9]        Fibromyalgia syndrome is a common and chronic disorder characterized by widespread muscle pain, fatigue, and multiple tender points. The word fibromyalgia comes from the Latin term for fibrous tissue (fibro) and the Greek ones for muscle (myo) and pain (algia).  Tender points are specific places on the body—on the neck, shoulders, back, hips, and upper and lower extremities—where people with fibromyalgia feel pain in response to slight pressure.

        Although fibromyalgia is often considered an arthritis-related condition, it is not truly a
                                                            (continued...)

July 11, 2000, plaintiff complained of low back pain after slipping on some stairs eight days prior. On July 17, 2000, plaintiff reported an intermittent burning sensation in her back and continued back pain. On July 26, 2000, plaintiff reported she was doing better. On February 9, 2001, plaintiff reported muscle spasms in her back. On May 15, 2001, plaintiff reported pain in her back with no apparent injury and no relief from pain pills. At this visit, medical records note that plaintiff was not prescribed Darvocet,[10] because she was "going to a specialist." (Tr. 127-34.)

In August 2000, plaintiff began seeing Kirk Brockman, M.D. Dr. Brockman noted plaintiff was diagnosed with fibromyalgia six months prior, and that Tylenol[11] was no longer helping her pain. He further noted plaintiff stated her whole body hurt and that she was depressed.

---

[9](...continued)
form of arthritis (a disease of the joints) because it does not cause inflammation or damage to the joints, muscles, or other tissues. Like arthritis, however, fibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities. Also like arthritis, fibromyalgia is considered a rheumatic condition.

National Institute of Arthritis and Musculoskeletal and Skin Diseases, at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm#fib_a (last visited August 19, 2005).

[10]Darvocet "is indicated for the relief of mild to moderate pain, either when pain is present alone or when it is accompanied by fever." PDR at 1709.

[11]Tylenol (acetaminophen) is used "[f]or the temporary relief of minor aches and pains associated with headache, muscular aches, backache, minor arthritis pain, common cold, toothache, menstrual cramps and for the reduction of fever." Id. at 1832.

He prescribed Darvocet, Trazadone,[12] and Soma.[13]   Plaintiff saw Dr.
Brockman again on September 26, 2000.  At that time, he discontinued
Trazadone and prescribed Remeron,[14] and he continued plaintiff on Soma
and Darvocet.  On January 3, 2001, plaintiff reported her depression was
doing better.   Dr. Brockman prescribed Oxycontin and Flexeril.[15]   On
February 9, 2001, plaintiff saw Dr. Sattman complaining of muscle spasms
in her lower back.  (Tr. 128, 170-72.)

On March 22, 2001, plaintiff saw David B. Fagan, M.D., for pain in
her left elbow.   Dr. Fagan diagnosed plaintiff with a supracondylar
humerus fracture and casted her arm.  On April 12, 2001, Dr. Fagan noted
plaintiff was only minimally tender and had a somewhat restricted range
of motion due to being in a cast.  (Tr. 153-54.)

On April 5, 2001, plaintiff saw Dr. Brockman for a medication
refill.  He noted fibromyalgia and depression.  He prescribed Paxil,[16]
and noted plaintiff's Oxycontin dose was not "lasting 12 hours."  On May
3, 2001, plaintiff reported difficulty sleeping, but that her pain was
better.   She was prescribed Ambien[17] and continued on Paxil and
Oxycontin.  On May 15, 2001, plaintiff saw Dr. Sattman complaining of

_____

[12]"Trazadone is used to treat depression.  Trazodone is in a class
of medications called serotonin modulators.  It works by increasing the
amount of serotonin, a natural substance in the brain that helps
maintain     mental     balance."     MedlinePlus     at
http://www.nlm.nih.gov/medlineplus/ druginfo /medmaster/a681038.html#why
(last visited August 19, 2005).

[13]Soma "is indicated as an adjunct to rest, physical therapy, and
other measures for the relief of pain, muscle spasm, and limited
mobility associated with acute, painful musculoskeletal conditions."
PDR at 3252.

[14]Remeron "is indicated for the treatment of  depression."  _Id._ at
2291.

[15]"Flexeril is indicated as an adjunct to rest and physical therapy
for  relief  of  muscle  spasm  associated  with  acute,  painful
musculoskeletal conditions."  _Id._ at 1929.

[16]"Paxil . . . is indicated for the treatment of depression."  _Id._
at 3115.

[17]Ambien "is indicated for the short-term treatment of insomnia."
_Id._ at 2974.

low back pain that was not being helped by pain medication.  In June and July 2001, plaintiff saw Dr. Brockman for medication refills, and she was continued on Oxycontin and Paxil.  (Tr. 127, 169-70.)

At an August 29, 2001, follow-up with Dr. Brockman, plaintiff noted she was feeling depressed, having more pain, was crying everyday, and had a decreased appetite.  Plaintiff further noted she ran out of her Paxil prescription.  Dr. Brockman prescribed Paxil, Oxycontin, and Zanaflex.[18]  On September 25, 2001, plaintiff reported that Zanaflex and Paxil were no help.  Dr. Brockman prescribed Pamelor[19] and Oxycontin.  On October 24, 2001, plaintiff reported that her depression was better, she was not crying, her appetite was good, and she was not obsessing over her mother's recent death.  On November 21, 2001, plaintiff reported her pain was improved, and she was prescribed Oxycontin, Ativan, and Celexa.  On December 20, 2001, plaintiff was prescribed Effexor, Oxycontin, Ativan, and Sonata.[20]  (Tr. 167-68.)

On January 21, 2002, plaintiff reported that Effexor was helping her depression, Sonata was helping with her insomnia, and she was walking on a treadmill.  Dr. Brockman prescribed Effexor, Sonata, and Oxycontin.  On February 20, 2002, plaintiff reported continued trouble sleeping, that her depression was better, that she still had daily pain and was taking Ativan for muscle spasms, and that she was walking on a treadmill for fifteen minutes daily.  Dr. Brockman prescribed Oxycontin, Ativan, and Effexor.  On March 22, 2002, Dr. Brockman prescribed Zyprexa,[21] Ativan, Oxycontin, and Effexor.  (Tr. 166-67.)

---

[18]Zanaflex "is a short-acting drug for the management of spasticity."  Id. at 671.

[19]Pamelor, otherwise referred to as "Nortriptyline, [is] an antidepressant, . . . used to treat depression."  MedlinePlus at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682620.html (last visited August 19, 2005).

[20]"Sonata is indicated for the short-term treatment of  insomnia." PDR at 3451.

[21]"Zyprexa is indicated for the management of the manifestation of psychotic disorders."  Id. at 1789.

On March 28, 2002, plaintiff saw Dr. Fagan for pain in her wrist and ankle after she fell while attending a bingo game. Radiological examination of the ankle was normal, but she had a distal radius fracture and an ulnar styloid fracture in her left wrist. Plaintiff's arm was casted, and Dr. Fagan opined that plaintiff may have some deformity in the wrist, but thought it would "function fairly well." On April 16, 2002, plaintiff reported pain in her ankle, but that her wrist was doing "fairly well." Radiological examination of plaintiff's ankle was essentially normal. Examination of the wrist showed her fracture was healing. On May 7, 2002, plaintiff reported significant pain in her wrist. Dr. Fagan noted plaintiff's distal radius fracture had healed, but the ulnar styloid fracture had yet to heal. He recommended plaintiff wear a wrist splint and do range of motion exercises. If plaintiff still reported problems, Dr. Fagan would consider physical therapy. (Tr. 150-52.)

On May 20, 2002, plaintiff again saw Dr. Brockman. He noted plaintiff reported being up all night and sleeping all day. He prescribed Effexor, Oxycontin, and Ativan. On June 19, 2002, plaintiff reported not doing well with her depression, no improvement with an increased Effexor dose, and that she had quit smoking for one month. Dr. Brockman prescribed Effexor, Celexa, Oxycontin, and Ativan. On July 17, 2002, plaintiff reported she was sleeping better, her depression was better, no change in her pain, and that she had not been smoking for two months. (Tr. 164-65.)

On August 21, 2002, plaintiff underwent a consultative examination by Jack C. Tippett, M.D. Dr. Tippett noted plaintiff could stand briefly on her heals and toes, could squat and return to a standing position while holding a table, could bend at the waist, could dress and undress herself, and could get on and off the examining table without assistance. Examination of the neck was essentially normal, with normal range of motion and no tenderness. Examination of the back revealed minimal tenderness and decreased range of motion. Examination of the upper extremities was essentially normal, except for tenderness in the left forearm, with decreased range of motion. Examination of the lower extremities revealed mild tenderness and mild limitation in range of

motion, which was somewhat resolved when plaintiff relaxed. Neurological examination was normal, with plaintiff oriented to time, person, and place. (Tr. 155-56, 159-60.)

Dr. Tippett found plaintiff had a healed left wrist fracture with some continued soreness and stiffness, chronic low back pain, and depression. Regarding plaintiff's diagnosis of fibromyalgia, Dr. Tippett opined "there is a disagreement about this term among well respected physicians and I do not choose to argue for or against the diagnosis." (Tr. 156-57.)

Dr. Tippett also completed a "Mini-Mental Status Examination." He assessed plaintiff a maximum score in all the following functions: orientation, registration, attention and calculation, recall and language. (Tr. 158.)

On September 5, 2002, consulting examiner Paul Stuve, Ph.D., completed a "Psychiatric Review Technique." Dr. Stuve found plaintiff had a medically determinable impairment of depression that did not satisfy the Listing for affective disorder. He further determined plaintiff was mildly limited in restriction of activities of daily living and in maintaining concentration, persistence or pace; was moderately limited in maintaining social functioning; and had no repeated episodes of decompensation. (Tr. 80-93.)

Dr. Stuve also completed a "Mental Residual Functional Capacity Assessment." He found plaintiff was moderately limited in her ability to complete a normal workday without interruptions from psychology-based symptoms, interact appropriately with the general public, and respond appropriately to changes in the work setting; she was "not significantly limited" to "moderately limited" in her ability to work in coordination with or proximity to others without being distracted; she was "not significantly limited" in her ability to remember locations and work procedures, understand short, simple instructions, carry out very short simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions and request assistance, accept instructions and respond to criticism, get along with

co-workers, maintain socially appropriate behavior and adhere to basic standards of cleanliness, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others; and she had no evidence of limitation in her ability to travel to unfamiliar places or use public transportation, carry-out detailed instructions, and understand and remember detailed instructions. (Tr. 94-97.)

On March 25, 2003,[22] Dr. Brockman completed a "Medical Source Statement-Physical." He found plaintiff is limited to standing or walking for one hour in an eight-hour day, but continuously for forty-five minutes, and sitting for eight hours in an eight-hour day, but continuously for one to two hours; she is limited in pushing and pulling; she is able to kneel and bend occasionally; and she was never able to climb, balance, stoop or crouch. He further determined plaintiff is unlimited in her ability to hear and see, but was limited in her ability to reach, handle, finger, feel and speak. Dr. Brockman further opined that plaintiff should be restricted from working in environments with heights, machinery, temperature extremes, dust, fumes, humidity, and vibration. Dr. Brockman found it would be necessary for plaintiff to assume a reclining position and supine position for up to thirty minutes one to three times per day. Moreover, plaintiff would need to prop up her legs two to three feet, one to three times per day while sitting. Dr. Brockman based his findings on plaintiff's fibromyalgia diagnosis, the chronic pain associated with fibromyalgia, and depression secondary to chronic pain. (Tr. 162-63.)

On April 9, 2003, plaintiff again saw Dr. Brockman. He prescribed Zyprexa, Oxycontin, and Ativan. On May 7, 2003, Dr. Brockman noted plaintiff was having nightmares so she stopped taking Zyprexa. He prescribed Oxycontin and Ativan. On June 6, 2003, plaintiff noted she continued to have chronic pain. Dr. Brockman prescribed Oxycontin,

---

[22]Although dated March 25, 2003, Dr. Brockman stated in a subsequent letter that his findings describe plaintiff's limitations as of August 22, 2000. (Tr. 185.)

Ativan, Lexapro,[23] Celexa, and Wellbutrin.[24]  On July 7, 2003, plaintiff
continued to report depression and chronic pain, but that the pain in
her elbow was better.  Dr. Brockman prescribed Celebrex, Oxycontin, and
Wellbutrin.  (Tr. 182-83.)


**B.    Plaintiff's Hearing Testimony**

On September 3, 2003, the ALJ conducted a hearing at which
plaintiff was represented by counsel.  At the hearing, plaintiff
testified that she lives with her husband and no children live in the
home.  Plaintiff completed school through the tenth grade.  Plaintiff
testified she last worked as a private duty nurse in 1995.  Plaintiff
cleaned a few houses with her daughter in 1998.  However, she testified
that she could not do the work, she received no money, and the only
reason she told her doctor about this work was so he would prescribe her
more Darvocet.  (Tr. 191-92, 197, 201.)

Plaintiff testified that she has been diagnosed with fibromyalgia,
which causes pain in her whole body.  The pain is worst in the joints
in her elbows, knees, back, legs and ankles.  The pain is a daily,
constant ache, but not necessarily a sharp pain.  Plaintiff testified
that treatment for this condition includes exercise, such as walking on
a treadmill.  Plaintiff is not always able to exercise due to pain.
Moreover, plaintiff testified that she is treated with medication.
Plaintiff took Darvocet at one point.  However, she had to get
prescriptions from multiple physicians to take eight to ten pills a day
for any relief.  Plaintiff further testified that medication and
exercise generally have not improved her condition, characterizing it
as worse since treatment.  At the time of the hearing, plaintiff

---

[23]Lexapro "is used to treat depression and generalized anxiety
disorder (excessive worrying that is difficult to control)."
M e d l i n e   P l u s   a t
http://www.nlm.nih.gov/medlineplus/druginfo/medmast er/a603005.html#why
(last visited August 19, 2005).

[24]"Wellbutrin is indicated for the treatment of depression."  PDR
at 1486.

testified that she was taking about six to nine Oxycontin pills per day, Carisoprodol,[25] Celebrex, Lorazepam, Wellbutrin, Lexapro, and Tylenol. Plaintiff reported no side-effects from her current medications except constipation. Plaintiff testified that she currently smokes about seven cigarettes a day. (Tr. 192-96, 204-07.)

Plaintiff further testified that she receives treatment for depression. Plaintiff testified that she has crying spells three or four times per week for up to one hour. When she cries, plaintiff testified that "I start praying and that will help me take it away." Plaintiff further testified that her mood fluctuates from being very depressed to feeling irritable from pain. Plaintiff testified that medication helps to some extent, but she is still depressed. (Tr. 198-99.)

Regarding activities of daily living, plaintiff testified that she tries to assist her husband with cooking and cleaning. However, she "can't do very much." Plaintiff can put clothes in the washer and dryer about three times per week, but her husband finishes the laundry. Plaintiff's husband does the grocery shopping. Plaintiff tries to prepare meals three days per week, "[s]omething out of a box or something. And of course, [my husband] helps me with that too." Plaintiff testified that she sleeps intermittently for a total of approximately four hours per night. Plaintiff has gained approximately thirty pounds. Plaintiff testified she spends most of the day laying in a long chair with pillows behind her, shifting "from hip to hip." She watches television about four hours per day. (Tr. 195, 197-98, 200, 206.)

Plaintiff testified she does not engage in social activities. She used to play bingo, take her grandchildren to the park, visit friends, and read. The last time she tried to play bingo was in August 2002, but when she went to bingo she fell down and broke her arm. Plaintiff has not attended bingo regularly since 1999, testifying she could not continue attending because she had to take more Oxycontin pain medication than prescribed due to pain from sitting, and the pain

---

[25]Carisoprodol is otherwise referred to as Soma. See supra note 12.

medication inhibited her ability to concentrate. Plaintiff testified she has not taken her grandchildren to the park in approximately four years, and that she stopped reading due to problems with memory she attributes to taking Oxycontin. Plaintiff used to attend church, but has not been to church service in five years. She was unable to attend a family reunion "because I couldn't take the ride in the car." Plaintiff further testified she leaves her home approximately one time per month to go to the doctor. Plaintiff has a driver's license but no automobile. She testified that she does not drive "because the last time I drove I backed into a car." (Tr. 199-203.)

Plaintiff testified that she can lift about one gallon of milk, experiencing pain if she lifts anything heavier. Plaintiff testified she can walk for about thirty minutes, stand for about thirty minutes, and sit in regular chairs, as opposed to her chair at home, for approximately twenty minutes without experiencing pain. (Tr. 207-09.)

## C. Vocational Expert's Hearing Testimony

Vocational Expert (VE) Brenda Young, M.A. testified at the hearing. The VE testified that plaintiff has past, relevant work as a private duty nurse and certified nurse's assistant, which are both semi-skilled at the heavy exertional level. The ALJ posited the following hypothetical to the VE:

> [A] worker able to perform generally at the light exertional capacity, who, as a part of the job would necessitate having limited contact with the public, limited interaction with co-workers on the job, would require a job that's routine—in other words, involving understanding, remembering, and following simple instructions and few changes in the job routine. If you assume those factors alone, could the past work be performed?

The VE testified that the past work could not be performed, but there are other jobs at the unskilled level such as file clerk (2,000 in the St. Louis area), as well as 10 or 12 other positions in the St. Louis area (approximately 22,000 jobs in the St. Louis area). (Tr. 19-20, 210-11.)

The ALJ posited a second hypothetical adding that the worker could only occasionally handle objects with the non-dominant hand. The VE

responded that both file clerk and janitorial positions would require more than occasional use of both hands, and that there would be no positions available with the addition of this limitation. (Tr. 211-12.)

The ALJ next asked the VE to assume the following hypothetical:

Again assuming a worker with the same education and experience as the claimant, who would be limited to no more than a total of one hour or standing and walking in a workday. And that couldn't be for longer than 45 minutes continuously. Worker would be able to sit for up to eight hours in the workday continuously, for up to two hours during that period of time. Should not engage in climbing, balancing, stooping, or crouching. Only occasionally kneel or bend. Would have limited ability for reaching, handling, fingering, feeling. If you were to assume those factors, are there other occupations that could be performed?

The VE responded there would be no available positions. (Tr. 212-13.)

## D.    The ALJ's Decision

In a September 23, 2003, decision denying benefits, the ALJ found plaintiff was not disabled within the meaning of the Act. Specifically, the ALJ found that plaintiff's impairments of fibromyalgia and depression, while severe impairments, did not meet or equal a Listing impairment entitling her to benefits. Moreover, the ALJ determined that plaintiff's alleged impairment of residual effects from the broken left wrist is irrelevant to the disability determination, as it occurred after the date plaintiff was last was insured for a period of disability.[26] (Tr. 11-12, 15.)

The ALJ reached this decision, in part, by review of the medical evidence. The ALJ found the medical evidence revealed that plaintiff's fibromyalgia improved with prescription medication, and that not all providers noted plaintiff had fibromyalgia. The ALJ declined to give deference to the medical opinion of Dr. Brockman that plaintiff could

---

[26]Plaintiff must be insured for a period of disability, as detailed in 20 C.F.R. §§ 404.101, 404.130-404.133, in order to be eligible for benefits. The ALJ determined that plaintiff's last insured date was December 31, 2000. Accordingly, the relevant time period for assessing plaintiff's disability status is between August 22, 2000 (the alleged disability on-set date) and December 31, 2000. Neither party challenges this portion of the ALJ's opinion.

not lift any amount of weight and that she could only stand or walk for a total of forty-five minutes in an eight-hour period, finding Dr. Brockman based his decision not on objective medical evidence, but on plaintiff's report that she had been diagnosed with fibromyalgia and experienced chronic pain.  (Tr. 13.)

Regarding plaintiff's mental health condition, the ALJ noted that, while medical records show plaintiff was depressed, plaintiff was prescribed no treatment other than medication, and plaintiff's depression was characterized as improving.  The ALJ also referred to the consulting psychologist's opinion that plaintiff's depression only moderately limited her ability to interact with others and respond to work-setting changes; caused no restrictions of daily activities; and caused mild difficulties maintaining concentration, persistence or pace.  (Tr. 13-14.)

The ALJ also based his decision on his finding that plaintiff's subjective complaints were not fully credible.  The ALJ noted that plaintiff sits in her chair all day, but alleges she can only sit for twenty minutes at a time.  Plaintiff alleges she has had depression her entire life, but plaintiff was able to work for a number of years with this condition.  While plaintiff alleges severe pain and depressive symptoms, treatment records show that medications were effective. Plaintiff complains of difficulty concentrating due to side-effects from Oxycontin, however, the ALJ found that the records do not show she reported these side-effects to her physician, and she was able to play bingo despite apparent difficulties with concentration.  (Tr. 14.)

The ALJ found that, during the relevant period, plaintiff had the RFC to lift, carry, push or pull twenty pounds occasionally and ten pounds frequently; sit, stand or walk six hours in an eight-hour day; and engage in simple routine work, with little change, and limited contact with co-workers and the public.  The ALJ found that this would allow plaintiff to work in a limited range at the light exertional base.  (Tr. 14.)

The ALJ recognized the VE's testimony that plaintiff could not return to her past, relevant work.  However, the VE testified that plaintiff could work, with the aforementioned RFC, as a file clerk or

a janitor, which together amount to a significant number of jobs in the St. Louis metropolitan area. Accordingly, the ALJ determined plaintiff is not disabled.

The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of defendant Commissioner subject to judicial review. (Tr. 3-5.)

In her appeal, plaintiff argues that (1) the ALJ erred in determining plaintiff's allegations were not credible, and (2) the ALJ's RFC determination was not supported by substantial evidence. (Doc. 13.)

## II. DISCUSSION

### A. General Legal Framework

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir. 2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.

To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the framework); Fastner v. Barnhart, 324

F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached.  20 C.F.R. § 404.1520(a)(4).

**B.    The ALJ's Credibility Determination**

Plaintiff argues that the ALJ failed to adequately assess her subjective complaints of pain.  Assessing a claimant's credibility is primarily the ALJ's function.  <u>See</u> <u>Anderson v. Barnhart</u>, 344 F.3d 809, 815 (8th Cir. 2003); <u>Holstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001).  In <u>Singh v. Apfel</u>, the Eighth Circuit held that an ALJ who rejects subjective complaints must make an express credibility determination explaining the reasons for discrediting the complaints. <u>Singh</u>, 222 F.3d 448, 452 (8th Cir. 2000).

The Eighth Circuit held in <u>Polaski v. Heckler</u> that an ALJ cannot reject subjective complaints of pain based solely on the lack of medical support, but instead must consider various factors.  739 F.2d 1320, 1322 (8th Cir. 1984).  The factors include, in part, observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  <u>Id.</u>

The ALJ based his decision on the relevant <u>Polaski</u> factors finding plaintiff's subjective complaints of pain, depression, and limitations thereof were not credible.  He based his decision primarily on the fact that medical records do not show an assessed, clinical finding of fibromyalgia, but only that plaintiff reported being diagnosed with the disorder; plaintiff received no treatment for her depression other than medication, which improved her symptoms; plaintiff proffered inconsistent statements when stating she sat in her chair all day, but could only sit in a chair for twenty minutes; plaintiff worked for years despite reporting life-long depression; plaintiff reported medication affected her concentration, but she was able to play bingo requiring adequate concentration; and medical records show medication and treatment effectively controlled plaintiff's pain.

It is not within the undersigned's purview to redetermine plaintiff's credibility.  As long as there is substantial evidence in the record, the ALJ's decision will be upheld even if substantial evidence exists adverse to the ALJ's findings.  See Kroqmeier, 294 F.3d at 1022; Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) ("ALJs must seriously consider a claimant's testimony about pain, even when . . . subjective.  But questions of credibility are for the trier of fact in the first instance.  If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment.")  Upon review of the ALJ's decision and the record evidence, the court finds that the ALJ's credibility determination was not based on substantial evidence.

The ALJ adverted to plaintiff's statement that she spends all day in her chair, but can only sit upright for twenty minutes at a time.  If true, these seemingly inconsistent statements would lend support to a finding that plaintiff's complaints were not fully credible.  See Britton v. Sullivan, 908 F.2d 328, 331 (8th Cir. 1990) (a claimant's inconsistent statements is a factor to consider in making a credibility determination).  A review of the record, however, shows that the ALJ mischaracterized plaintiff's statements.  In her hearing testimony, plaintiff clearly differentiates between the chair she spends all day in (a long chair she lays down on with pillows behind her) and her ability to only sit upright for twenty minutes in a "regular" chair.  Taken in context, these statements are not as inconsistent as the ALJ advances.

Similarly, the ALJ mischaracterized plaintiff's ability to play bingo despite problems with concentration.  Plaintiff testified at the hearing that she has not regularly attended bingo games since 1999, and she noted in her July 2002 claimant questionnaire that she was no longer able to attend bingo games.  The last time she attempted to attend bingo was in August 2002.  The record does not reflect a consistent pattern of attending bingo games, or other activities, lending support to the ALJ's credibility determination.  See Ludden v. Bowen, 888 F.2d 1246, 1248 (quoting Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989) (a claimant "'need not be completely bedridden or unable to perform any

household chores to be considered disabled'")); <u>see</u> <u>also</u> <u>Kelley v.</u>
<u>Callahan</u>, 133 F.3d 583, 588-89 (8th Cir. 1998).

The ALJ further noted that, despite stating she has suffered life-long depression, plaintiff was able to work for a number of years.  The ability to work for a period of time, despite a disabling condition, and absent deterioration of that condition, can lessen plaintiff's credibility.  <u>See</u> <u>Dixon</u>, 905 F.2d at 238.  However, in this instance, the facts do not support this conclusion.

While plaintiff reported battling depression over her lifetime, the record does not indicate plaintiff's functional ability during the time period when she was consistently working.  Plaintiff's wage history shows that she stopped work in 1995.  After that time, the record reflects consistent treatment for, and complaints of, depression. Accordingly, the ALJ's finding that plaintiff was able to work for a number of years despite suffering depression is not grounded in the evidence of record.

With respect to depression, the ALJ noted that plaintiff has no history of seeking mental health treatment with psychiatrists, psychologists, or other mental health professionals.  Her only treatment has been medication, which the ALJ found improved her condition.  The ALJ is correct that medical records indicate instances where plaintiff reported her depressive symptoms were improved.  However, a substantial portion of the records reveals consistent, chronic depression requiring alternating, multiple drug therapies.  From 1996 until 2003, and during the relevant determination period, plaintiff complained regularly of depression and depressive symptoms.  Also during this time period, plaintiff was essentially taking at least one if not multiple prescription medications for depression, some of which were discontinued after plaintiff reported they were no longer working or were producing unpleasant side-effects.

While the record shows plaintiff's depression treatment was managed by non-mental health specialists, they were all medical doctors or osteopaths.  Moreover, there is no indication that plaintiff was referred to a mental health specialist and refused to comply with such treatment.  <u>See</u> <u>Forehand v. Barnhart</u>, 364 F.3d 984, 988 (8th Cir. 2004)

("While [plaintiff] may not have sought specific psychiatric treatment, she did consistently seek treatment from physicians for her mental health, as evidenced by [physician's] notes and prescriptions."); <u>cf.</u> <u>Edwards v. Barnhart</u>, 314 F.3d 964, 967 (8th Cir. 2003) (ALJ may discount claimant's subjective complaints of pain based on failure to pursue regular medical treatment).

The ALJ further determined that plaintiff's complaints of pain were belied by relief she experienced from pain medication. The record shows plaintiff has consistently taken strong pain medication for a number of years, which lends support to her complaints of pain. <u>Cf.</u> <u>Johnson v.</u> <u>Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing <u>Haynes v. Shalala</u>, 26 F.3d 812, 814 (8th Cir. 1994) ("[A] claimant's failure to take strong pain medication is "inconsistent with subjective complaints of disabling pain.")). However, the record further shows that plaintiff's pain may not have been sufficiently improved by pain medication to lessen her credibility regarding pain and limitations thereof.

The record reveals occasional instances where plaintiff reported improved pain. For the most part, however, plaintiff reported consistent pain in her back, as well as pain in her joints and full body, despite taking pain medication, and medication for muscle spasms. Plaintiff's consistent complaints to providers regarding pain, coupled with her minimal activities of daily living, do not detract from her credibility to the extent suggested by the ALJ.

The ALJ further supports his credibility decision by noting that no provider has officially diagnosed plaintiff with fibromyalgia, but simply recognized her statement that she was diagnosed with the condition. Specifically the ALJ noted that plaintiff's treating provider for a number of years, Dr. Sattman, "made no mention of fibromyalgia." A review of the record, however, reveals that Dr. Sattman specifically noted "Fibromyalgia" as early as June 30, 2000. [27]

With respect to Dr. Brockman, the ALJ noted that Dr. Brockman recognized plaintiff's statement that she had been diagnosed with fibromyalgia, but his treatment records lack his assessment of this

_____

[27]Plaintiff may have been diagnosed with fibromyalgia sooner; however, the treatment records are difficult to read.

diagnosis including accepted pressure point triggers and the presence of chronic pain for at least three months. Fibromyalgia is a chronic condition, usually diagnosed after eliminating other conditions, for which no confirming diagnostic tests exist. See Forehand, 364 F.3d at 987. The Eighth Circuit "has long recognized fibromyalgia might be disabling." Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).

The ALJ is correct that fibromyalgia can be diagnosed by assessing particular "trigger points,"[28] and that plaintiff's medical records do not contain any narrative trigger point assessment. However, Dr. Brockman consistently found that plaintiff had fibromyalgia over multiple appointments and well after initially noting plaintiff's statement that she suffered from the condition. His records suggest that he based plaintiff's treatment on his assessment that she suffered from fibromyalgia, and there is no reason to conclude that Dr. Brockman would base a three-year treatment relationship on plaintiff's mere belief she suffers from fibromyalgia without, in fact, believing his clinical assessment supported such a diagnosis.[29] Cf. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975) ("An administrative law judge may not draw upon his own

---

[28]    According to the [American College of Rheumatology]'s 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points. Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories. See Jeffrey Larson, Fibromyalgia, in 2 The Gale Encyclopedia of Medicine 1326-27 (Jacqueline L. Longe et al. eds., 2d ed. 2002).

Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003).

[29]  Moreover, the record shows that Dr. Brockman ordered multiple laboratory tests over a period of time, which may suggest Dr. Brockman diagnosed plaintiff with fibromyalgia after ruling out other conditions. (Tr. 173-179).

inferences from medical reports."")); see also Shontos v. Barnhart, 328
F.3d 418, 427 (8th Cir. 2003).

Upon full review of the record, the court finds that the ALJ's
credibility determination was not supported by substantial evidence of
record. On remand, the ALJ must reconsider plaintiff's credibility in
light of the entire record and the court's discussion.

## C.   The ALJ's RFC Determination

The RFC is "the most [a claimant] can still do despite" his or her
"physical or mental limitations." 20 C.F.R. § 404.1545(a); see also
Depover v. Barnhart, 349 F.3d 563, 565 (8th Cir. 2003). In determining
plaintiff's RFC, the ALJ must engage in "a function-by-function
assessment based upon all of the relevant evidence of an individual's
ability to do work-related activities." S.S.R. 96-8p, 1996 WL 374184,
at *3 (Soc. Sec. Admin. July 2, 1996). An RFC determination is a medical
issue, Singh, 222 F.3d at 451, which requires consideration of supporting
evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704
(8th Cir. 2001). The ALJ is required to determine plaintiff's RFC based
on all the relevant evidence. See Anderson v. Shalala, 51 F.3d 777, 779
(8th Cir. 1995); 20 C.F.R. §§ 404.1546, 416.946 (2001).

Essentially, plaintiff argues that the ALJ failed to defer to Dr.
Brockman's opinion as plaintiff's long time, treating provider.  "A
treating physician's opinion should not ordinarily be disregarded and is
entitled to substantial weight." Singh, 222 F.3d at 452. If a treating
physician's opinion is well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with other
substantial evidence in the record, the opinion should be given
controlling weight. Id. A treating physician's opinions must be
considered along with the evidence as a whole, and when a treating
physician's opinions are inconsistent or contrary to the medical evidence
as a whole, they are entitled to less weight. See id.; Sampson v. Apfel,
165 F.3d 616, 618 (8th Cir. 1999). An ALJ should "give good reasons" for
discounting a treating physician's opinion. Dolph v. Barnhart, 308 F.3d
876, 878-79 (8th Cir. 2002).

The ALJ found that Dr. Brockman's opinion was not supported by objective, medically acceptable evidence. Therefore, his opinion as a treating provider was not entitled to substantial deference. Moreover, to the extent that Dr. Brockman's RFC assessment was based on plaintiff's subjective complaints of pain, the ALJ found the assessment was not well-supported, because the ALJ had determined that plaintiff was not fully credible. See Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996) (an ALJ may discount physician's opinion that is based on discredited subjective complaints).

Dr. Brockman supported his RFC assessment by stating that plaintiff has fibromyalgia and chronic pain associated with the disease. Having found that the ALJ's credibility determination was not supported by substantial evidence, on remand the ALJ will need to re-evaluate the portion of his RFC assessment of plaintiff's chronic pain as support for Dr. Brockman's evaluation.

As previously discussed, the ALJ believed that Dr. Brockman's diagnosis of fibromyalgia was based on plaintiff's self-report, not on objective, clinical facts, adverting to methods of diagnosis such as long-term pain with trigger point identification. However, fibromyalgia is often diagnosed by ruling out other conditions, with no clear protocol for diagnosis. See Brosnahan, 336 F.3d at 672 n.1 ("Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests."); see also Garza, 397 F.3d at 1089; Forehand, 364 F.3d at 987. The record itself reflects this notion in Dr. Tippett's reluctance to answer the ALJ's questions regarding plaintiff's fibromyalgia diagnosis stating "there is a disagreement about this term among well respected physicians and I do not choose to argue for or against the diagnosis."

Dr. Brockman's medical records show that he ordered laboratory testing, consistently noted plaintiff's chronic pain, and diagnosed plaintiff with fibromyalgia on repeated occasions. The fact that Dr. Brockman did not clearly identify a trigger point assessment in his medical records related to a debated, difficult-to-diagnosis medical condition does not necessarily constitute a lack of objective medical evidence on which he based his RFC assessment.

-23-

"A disability claimant has the burden to establish [his] RFC." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); see 20 C.F.R. § 404.1512(c) ("Your responsibility. . . . You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your case."). However, the "ALJ has a duty to fully develop the record. Although that duty may include re-contacting a treating physician for clarification of an opinion, that duty arises . . . if a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (internal citations omitted). In this case, Dr. Tippett was specifically asked by SSA to assess plaintiff's diagnosis of fibromyalgia; Dr. Tippett declined. The doubts or questions the ALJ had regarding the basis or accuracy of plaintiff's fibromyalgia diagnosis, a crucial issue in this matter, should have been addressed by additional medical sources or by follow-up with Dr. Brockman.

For these reasons, the final decision of the Commissioner is reversed and remanded in accordance with this Memorandum.

An appropriate order shall issue herewith.


DAVID D. NOCE
UNITED STATES MAGISTRATE JUDGE


Signed on September 6, 2005.

-24-